AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)          ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

L O D G E D

CLERK, U.S. DISTRICT COURT

JUL - 2 2024

CENTRAL DISTRICT OF CALIFORNIA

BY: _____ rsm _____ DEPTUY

| | |
|---|---|
| United States of America | |
| v. | |
| Humberto Ugalde, | |
| Defendant | |

Case No.  **2:24-mj-03970-DUTY**

FILED
CLERK, U.S. DISTRICT COURT

July 2, 2024

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ch _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 11, 2024, in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(B) | Possession with Intent to Distribute Controlled Substances |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Adam Cirillo*
_____
*Complainant's signature*

Adam Cirillo, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  _____July 2, 2024_____

*Judge's signature*

City and state:   Los Angeles, California

Hon. Brianna Mircheff, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alexander S. Gorin (x3190)

## AFFIDAVIT

I, Adam J. Cirillo, being duly sworn, declare and state as follows:

## I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint against Humberto UGALDE ("UGALDE") for violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances).

2.   This affidavit is also made in support of an application for a warrant to search a gray Samsung cellphone with IMEI # 354144111120554 assigned cellphone number 951-330-8440 seized from UGALDE (the "SUBJECT DEVICE") and currently in the custody of the Drug Enforcement Administration ("DEA"), in Los Angeles, CA, as described in Attachment A.

3.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "SUBJECT OFFENSES").

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my

1

knowledge of or investigation into this matter.  Unless
specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

5.   I am a Special Agent with the DEA. I am currently
assigned to the Los Angeles Field Division ("LAFD"). As such, I
am an "investigative or law enforcement officer" of the United
States within the meaning of 18 U.S.C. § 2510(7); that is, an
officer of the United States empowered by law to conduct
investigations of, and to make arrests for, offenses enumerated
in 18 U.S.C. § 2516.

6.   I have worked for the DEA as a Special Agent since
December 2019. Prior to becoming a DEA Special Agent, I was a
sworn law enforcement officer with the Cobb County Police
Department in the state of Georgia. As such, I was tasked with
conducting law enforcement operations involving drug nexuses.
Cumulatively, I have approximately six years of sworn law
enforcement experience.

7.   I have received training and have experience
investigating violations of both state and federal narcotics and
money laundering laws, including, but not limited to 21 U.S.C.
§§ 841, 846, 952, 959, and 963, and 18 U.S.C. § 1956(a). I have
been involved in electronic surveillance methods, the debriefing
of defendants, informants, and witnesses, as well as others who
have knowledge of the manufacturing, distribution,
transportation, and storage of controlled substances and the

laundering of drug proceeds. Prior to becoming a DEA Special
Agent, I attended a 17-week Basic Agent Academy at the DEA
Training Academy in Quantico, Virginia. I also attended a 23-
week police academy in Cobb County, Georgia. Over the course of
my career, I have received both formal and informal training
regarding money laundering, drug trafficking and distribution,
and other applicable criminal laws.

8.    Throughout my law enforcement career, I have
investigated individuals and criminal organizations, which have
represented a significant threat to public safety. Specifically,
during the course of my employment, I have received
comprehensive, formalized instruction to include such topics as
drug identification, money laundering techniques, patterns of
drug trafficking, complex conspiracies, the exploitation of
narcotics traffickers' telecommunications devices, criminal law,
surveillance, and other investigative techniques. I have
participated in investigations into the unlawful possession with
intent to distribute, and distribution of narcotics and
controlled substances, the laundering of narcotics proceeds,
trafficking of controlled substances and list (precursor)
chemicals, and conspiracies associated with those offenses.

9.    I have participated in many aspects of drug
investigations. I am familiar with narcotics traffickers'
methods of operation, including the manufacturing, storage,
transportation, and distribution of narcotics, the collection of
money that represents the proceeds of narcotics trafficking, and
money laundering. I am also familiar with the manner in which

narcotics traffickers transport and distribute narcotics in areas they control.

10.  The information contained within this affidavit is based upon my own investigation and upon information provided to me by other law enforcement officers. Where conversations or statements of others are related herein, they are related in substance and in part. Moreover, because this affidavit is submitted for a limited purpose, I have not set forth every fact that I have learned in the course of the investigation.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

11.  On February 26, 2024, UGALDE used his T-Mobile cellphone 951-330-8440 (the "-8440 number"), to coordinate a meeting with another individual ("Co-Conspirator 1") at 32230 Sage Road, Hemet, CA, 92544. Shortly thereafter, UGALDE met Co-Conspirator 1 and gave him a box containing approximately 14.4 kilograms of fentanyl from the trunk of UGALDE's car, a black Dodge Challenger "SRT" (the "Challenger").

12.  Law enforcement personnel obtained the WhatsApp communications between Co-Conspirator 1 and UGALDE, the user of -8440 number, directing Co-Conspirator 1 to meet at 32230 Sage Road, Hemet, CA, 92544, for the "package."[1]

13.  Law enforcement conducted a driver's license query on UGALDE, and a CA DMV vehicle registration query on the Challenger. According to these records, the Challenger is registered to a Humberto UGALDE with a specific address located

---

[1] The WhatsApp conversation took place in Spanish. The conversation was translated for me by DEA Special Agent Anthony Parra, who is fluent in Spanish.

on Minto Way, Hemet, CA (i.e., the "Minto Way Address"). Additionally, UGALDE has additional vehicles such as a 2006 GMC with California license plate ending in 305 also registered to UGALDE at the Minto Way Address. UGALDE's California license also lists his address as the Minto Way Address.

14. Border crossing records show that UGALDE crossed into the United States on January 8, 2024, in the Challenger. LAFD DEA agents obtained a photograph of UGALDE from Task Force Officer (TFO) Paul Caporaso, which was obtained from a U.S. border crossing photograph. The photo resembled that of UGALDE's California DMV photograph, however he had significantly different hair length. According to DMV records, border crossing records and Thomson Reuters law enforcement database, UGALDE appeared to live at the Minto Way Address.

15. Law enforcement personnel performed surveillance in the area of the Minto Way Address and saw the Challenger parked in the driveway of Minto Way Address on multiple occasions.

16. Based on law enforcement surveillance and open-source information, the Minto Way Address is in a rural mountain terrain area of Hemet, CA, and has limited driving-routes to get to the major access road in Hemet. DEA agents analyzed the area surrounding where UGALDE delivered the fentanyl to Co-Conspirator 1, 32230 Sage Road, Hemet, California, and believe it was selected as the meeting location due to the fact that it is located on one of only two exit routes that UGALDE would be able to use to get from the Minto Way Address to any main access road.

5

17.  On May 29, 2024, the Honorable Steve Kim, United States Magistrate Judge for the Central District of California, authorized a federal search warrant for the Minto Way Address. The assigned court case number is 2:24-mj-03137.

18.  On June 11, 2024, LAFD Strike Force ("SF") agents executed the search warrant at the Minto Way Address and seized numerous firearms that included pistols and rifles, approximately 185 grams of suspected fentanyl, as well as approximately $10,000 in United States Currency.

## IV. STATEMENT OF PROBABLE CAUSE

**A.    DEA Identifies Individuals Associated with a Drug Trafficking Organization Looking to Sell Fentanyl**

19.  In December 2023, federal agents debriefed a DEA Confidential Source ("CS-1[2]") regarding Hernan Domingo Ojeda-Lopez ("Ojeda-Lopez") and Hernan Geovani Ojeda-Elenes ("Ojeda-Elenes"). According to CS-1, he/she has known Ojeda-Lopez for a long time because they are both from the same town in Culiacan, Sinaloa, Mexico.

20.  CS-1 told law enforcement that he/she knows that Ojeda-Lopez runs a drug trafficking organization from his/her conversations and meetings with Ojeda-Lopez. According to CS-1, Ojeda-Lopez transports fentanyl from Sinaloa to Tijuana and

---

[2] CS-1 has worked with the DEA in multiple prior investigations in Tucson, Arizona.  CS-1 was previously involved in drug trafficking and was charged.  CS-1 is receiving immigration benefits.  I have personally met with CS-1.  I and other law enforcement have taken steps to corroborate information provided by CS-1 and the information by CS-1 has shown to be reliable and accurate.

Mexicali, where it is then transported across the border and into the United States. CS-1 stated that Ojeda-Lopez smuggles fentanyl into the United States through tractor-trailers.  CS-1 stated that Ojeda-Lopez traffics at least one ton of fentanyl per month from Mexico into the United States.

21.  During the debriefing, CS-1 was instructed by agents to speak with Ojeda-Lopez and to inform him that CS-1 would be interested in purchasing fentanyl.

**B.  CS-1 Meets with Ojeda-Lopez and Discusses Purchasing Narcotics**

22.  Based on my personal knowledge of the investigation, and according to CS-1, I know that in early 2024, CS-1 met with Ojeda-Lopez at his ranch and spoke with him about purchasing fentanyl. CS-1 stated that Ojeda-Lopez agreed to sell CS-1 fentanyl for $12,000 per kilogram.

23.  CS-1 told law enforcement that several days later, CS-1 obtained a cellphone number ending in 4957 (the "4957 number") for Ojeda-Lopez.

24.  Shortly thereafter, CS-1 placed a recorded phone call to Ojeda-Lopez at the 4957 number. On the call, Ojeda-Lopez told CS-1 that the fentanyl was currently in Mexicali and should be crossing the border that coming weekend and would be arriving in the Los Angeles area a couple days later. CS-1 told Ojeda-Lopez that he/she had a buyer in the Los Angeles area. Ojeda-Lopez agreed to sell one kilogram of fentanyl to CS-1's buyer for $12,000.

25.   That same month CS-1 placed a recorded phone call to Ojeda-Lopez at the 4957 number. CS-1 confirmed the buyer wanted one kilogram of fentanyl and Ojeda-Lopez requested the telephone number of the buyer in the United States in order to pass the buyer's telephone number to the Los Angeles-based distributor of the fentanyl.

26.   A day later, CS-1 texted Ojeda-Lopez the cellphone number of the purported buyer, another DEA confidential source ("CS-2")[3].

### C.   Co-Conspirator 1 and CS-2 Arrange a Meeting in Los Angeles to Sell Fentanyl

27.   After CS-1 provided the number of CS-2 as the alleged buyer of the fentanyl to Ojeda-Lopez, CS-2 was contacted at that number by an individual ("Co-Conspirator 1").  At the time, Co-Conspirator 1 was acting as a distributor working for Ojeda-Lopez. According to information provided by CS-2, on January 29, 2024, CS-2 and Co-Conspirator 1 agreed to meet on January 30, 2024, near the East Los Angeles Doctors Hospital, located at 4060 Whittier Blvd, Los Angeles, CA 90023. During a recorded phone call between Co-Conspirator 1 and CS-2, Co-Conspirator 1 asked CS-2 whether CS-2 was informed on the price. CS-2 told Co-Conspirator 1 $12,000, which Co-Conspirator 1 confirmed was the price.

---

[3] CS-2 has worked with the DEA in multiple prior investigations. CS-2 was previously involved in drug trafficking and was charged. CS-2 is receiving immigration benefits and is being paid to assist law enforcement. I have personally met with CS-2. I and other law enforcement have taken steps to corroborate information provided by CS-2 and the information by CS-2 has shown to be reliable and accurate.

28.  On January 30, 2024, at approximately 12:24 P.M., I and other DEA agents saw Co-Conspirator 1 arrive at Herbert Avenue, east of East Los Angeles Doctors Hospital. Co-Conspirator 1 was driving a white Honda Civic. I then observed Co-Conspirator 1 park next to CS-2 and sell CS-2 approximately one kilogram of fentanyl for $12,000. Shortly thereafter, DEA agents obtained the fentanyl from CS-2, transported the fentanyl to the Los Angeles Field Office ("LAFD") and later sent the fentanyl to DEA Southwest Lab for testing. On March 8, 2024, the test results came back positive for fentanyl.

**D.    Co-Conspirator 1 is Directed to Pick Up 15 Kilograms of Fentanyl**

29.  According to information provided by CS-2, on February 9, 2024, CS-2 received a text message from a Mexican phone number ending in -1727 which, according to CS-2, was used by Ojeda-Lopez. During following recorded phone calls between Ojeda-Lopez and CS-2, Ojeda-Lopez asked CS-2 if he/she would be interested in transporting 15 kilograms of fentanyl to Indianapolis, Indiana. CS-2 agreed to transport the 15 kilograms of fentanyl for $1,800 per kilogram.

30.  According to information provided by CS-2, on February 26, 2024, CS-2 called Ojeda-Lopez and Ojeda-Lopez told CS-2 that his "amiga" already had the 15 kilograms of fentanyl and she would have Co-Conspirator 1 go and pick it up.

**E.    Co-Conspirator 1 is Directed by Meza-Urrea to Pick up Drugs from UGALDE**

31.  According to text messages law enforcement has recovered between Shamanta Meza-Urrea ("Meza-Urrea") and Co-

Conspirator 1, Meza-Urrea would direct Co-Conspirator 1's activity and give him/her instructions on where and when to pick up drug deliveries. In a WhatsApp text message conversation between Co-Conspirator 1 and Meza-Urrea between February 25 and 26, 2024, Meza-Urrea directed Co-Conspirator 1 to do a trip to pick up the fentanyl from an individual identified as "Tio."

32.   According to messages recovered from Co-Conspirator 1's phone, on or about February 26, 2024, Meza-Urrea sent Co-Conspirator 1's cellphone number to a person named "Tio" and Meza-Urrea told Co-Conspirator 1 that he/she would be receiving a phone call or text message on behalf of "Tio".   Co-Conspirator 1 agreed to pick up the drugs on behalf of Meza-Urrea. The following is the conversation that occurred between Co-Conspirator 1 and Meza-Urrea. The conversation was in Spanish, and was translated to English by DEA SA Parra, a native Spanish speaker:

| MEZA | 7:49 p.m.; 2/25/24 | If you want |
|------|--------------------|-------------|
| MEZA | 7:49 p.m.; 2/25/24 | To do another round trip |
| MEZA | 7:50 p.m.; 2/25/24 | I will send your number to my tio |
| Co-Conspirator 1 | 7:55 p.m.; 2/25/24 | When |
| Co-Conspirator 1 | 7:55 p.m.; 2/25/24 | ***-***-9123 |
| MEZA | 7:55 p.m.; 2/25/24 | They are going to call |
| MEZA | 7:55 p.m.; 2/25/24 | On behalf of tio |
| MEZA | 7:55 p.m.; 2/25/24 | To coordinate the details |
| Co-Conspirator 1 | 7:55 p.m.; 2/25/24 | Sounds good |
| Co-Conspirator 1 | 10:36 a.m.; 2/26/24 | *screenshot of a map displaying a one hour and 48 min trip from Los Angeles area to 32230 Sage Rd in the Hemet, CA area. |
| Co-Conspirator 1 | 10:36 a.m.; 2/26/24 | All the way over here. idiot |
| MEZA | 10:37 a.m.; 2/26/24 | You are on your way or what |
| MEZA | 10:37 a.m.; 2/26/24 | Be careful |
| Co-Conspirator 1 | 10:37 a.m.; 2/26/24 | What the heck so do I just go pick her up and take her back home |
| Co-Conspirator 1 | 10:38 a.m.; 2/26/24 | No well I am going |
| Co-Conspirator 1 | 10:38 a.m.; 2/26/24 | I told him I will go when I get out from work at 1 |

| MEZA | 10:39 a.m.; 2/26/24 | Ok |
|------|---------------------|-----|
| MEZA | 10:40 a.m.; 2/26/24 | Well I am not sure so coordinate the details together |
| Co-Conspirator 1 | 10:41 a.m.; 2/26/24 | Yes, he told me its okay. But whats up who is he? |
| MEZA | 10:50 a.m.; 2/26/24 | I don't know |
| Co-Conspirator 1 | 10:52 a.m.; 2/26/24 | What the heck isn't this on behalf of tio |
| Co-Conspirator 1 | 10:52 a.m.; 2/26/24 | What up I am going to a 4 idiot |
| MEZA | 11:01 a.m.; 2/26/24 | Yes |
| Co-Conspirator 1 | 11:36 a.m.; 2/26/24 | The same |
| Co-Conspirator 1 | 11:36 a.m.; 2/26/24 | Okay but will it be like every other time where I go pick up by my self and bring it and then you give me the money?? Or is that idiot going to pay |
| MEZA | 11:36 a.m.; 2/26/24 | I don't know |
| MEZA | 11:36 a.m.; 2/26/24 | Let me ask |
| MEZA | 12:17 p.m.; 2/26/24 | Bring it |
| MEZA | 12:18 p.m.; 2/26/24 | then you will hand it off and then they will give you the money |
| MEZA | 12:18 p.m.; 2/26/24 | I will ask him how much |
| MEZA | 2:41 p.m.; 2/26/24 | Did you end up going |
| MEZA | 2:42 p.m.; 2/26/24 | ?? |
| Co-Conspirator 1 | 2:42 p.m.; 2/26/24 | Yes I am on my way but there is a freaking crash |
| Co-Conspirator 1 | 2:42 p.m.; 2/26/24 | The traffic is moving slow |
| MEZA | 2:42 p.m.; 2/26/24 | Ok |
| MEZA | 4:07 p.m.; 2/26/24 | Did you arrive o k |
| Co-Conspirator 1 | 4:11 p.m.; 2/26/24 | I will get there at 5 there is a lot of traffic also tony called and I am going to give him the merchandise to him tomorrow. I asked him if he was going to pay me for the merchandise but he told me to coordinate the payment with tio. And I imagine you will get the payment. Or not I don't know. |
| MEZA | 4:12 p.m.; 2/26/24 | Yes I will do something |
| MEZA | 7:14 p.m.; 2/26/24 | Where are you at |
| Co-Conspirator 1 | 7:18 p.m.; 2/26/24 | I stopped to get fast food at pollo loco |
| Co-Conspirator 1 | 7:19 a.m.; 2/26/24 | But I am about 20 from the house |
| MEZA | 7:32 p.m.; 2/26/24 | ok |
| MEZA | 9:21 p.m.; 2/26/24 | Missed call |
| MEZA | 9:08 p.m.; 2/26/24 | !? |
| MEZA | 9:08 p.m.; 2/26/24 | Where are you |
| MEZA | 9:13 p.m.; 2/26/24 | Idiot where are you |
| MEZA | 9:13 p.m.; 2/26/24 | Its night time |
| MEZA | 9:16 p.m.; 2/26/24 | Missed call |
| MEZA | 9:35 p.m.; 2/26/24 | Missed call |

33.   Regarding the seizure of fentanyl that led to the
arrest of Co-Conspirator 1, he/she was offered the trip by Meza-
Urrea on or about February 25 or 26, 2024. Meza-Urrea texted Co-
Conspirator 1 the pickup location of 32230 Sage Rd, Hemet, CA,
where Co-Conspirator 1 was directed to meet an unknown person
who would give him/her an item. Meza-Urrea told Co-Conspirator 1
that she would send Co-Conspirator 1's phone number to "TIO" and
that Co-Conspirator 1 should expect a telephone call from
someone calling "de parte del Tio" (translated as "on behalf of
Tio") to arrange the "trip."  Co-Conspirator 1, while driving to
the aforementioned meet location, was contacted via WhatsApp by
"Wilbert" who was using telephone number ending in 8440 (the "-
8440 number") who confirmed he was calling on behalf of TIO and
provided Co-Conspirator 1 the same aforementioned meet location
that Meza-Urrea had given Co-Conspirator 1.

34.   On March 5, 2024, DEA obtained a recording of a
telephone call between Meza-Urrea and "TIO" discussing the law
enforcement seizure of fentanyl and arrest of a courier that
occurred in late February 2024.  During the call, Meza-Urrea and
TIO discuss the future court date listed for Co-Conspirator 1
and how to gather more information on how law enforcement was
able to seize the fentanyl.

35.   According to text messages provided to law
enforcement, on February 26, 2024, Co-Conspirator 1 was
contacted by the -8440 number via WhatsApp. The contact name for
the -8440 number was list as "Wilbert." The conversation took

place in Spanish, but was translated by DEA SA Parra, a native
Spanish speaker.

36. Below are the translated text messages exchanged
between the -8440 number, used by UGALDE, and Co-Conspirator 1:

| UGALDE | 10:29 a.m.; 2/26/24 | On behalf of your uncle[4] |
| Co-Conspirator 1 | 10:33 a.m.; 2/26/24 | Hey how are you talk to me |
| UGALDE | 10:34 a.m.; 2/26/24 | I have your order[5] |
| UGALDE | 10:34 a.m.; 2/26/24 | 32230 Sage Rd, Hemet, CA 92544 |
| Co-Conspirator 1 | 10:37 a.m.; 2/26/24 | Okay well look right now I am working I get out at 1. After I can go by |
| UGALDE | 10:38 a.m.; 2/26/24 | Okay good to go |
| Co-Conspirator 1 | 1:47 p.m.; 2/26/24 | I am on my way there but there is a bit of traffic |
| UGALDE | 1:43 p.m.; 2/26/24 | Let me know when you are 15 minutes before |
| Co-Conspirator 1 | 2:46 p.m.; 2/26/24 | I'm Sorry for the tardiness it's because there was a crash and traffic. It's showing me it will take me 2 hours to get there I will try getting there quicker |
| UGALDE | 2:48 p.m.; 2/26/24 | Thumbs up emoji |
| UGALDE | 4:47 p.m.; 2/26/24 | Are you almost here |
| Co-Conspirator 1 | 4:48 p.m.; 2/26/24 | Yes in 15 |
| Co-Conspirator 1 | 4:48 p.m.; 2/26/24 | 25 |
| UGALDE | 4:48 p.m.; 2/26/24 | Ok |
| Co-Conspirator 1 | 5:10 p.m.; 2/26/24 | I'll be there in 10 |
| UGALDE | 5:18 p.m.; 2/26/24 | Thumbs up emoji |
| Co-Conspirator 1 | 5:20 p.m.; 2/26/24 | I am outside |
| UGALDE | 5:20 p.m.; 2/26/24 | 38 second voice call (incoming) with Co-Conspirator 1. |

37. According to information provided from Co-Conspirator
1's phone, at approximately 5:20 p.m., Co-Conspirator 1 called

---

[4] "Uncle" is "tio" in Spanish.

[5] SA Parra translated this conversation from Spanish to
English based on his training and experience and his status as a
native Spanish speaker. According to SA Parra, Ugalde used the
Spanish word "escarga" which translates directly to "I have your
order" but in the context of the conversation, would have the
same meaning as "I have your package".

the -8440 number, as Co-Conspirator 1 arrived at the meet
location 32230 Sage Road, Hemet, CA.

38.   Later that night, law enforcement approached Co-
Conspirator 1 and asked Co-Conspirator 1 to consent to a search
of his/her vehicle. Co-Conspirator 1 consented to the search.
During the search, law enforcement found a cardboard box that
contained 15 rectangular packages wrapped in clear cellophane
wrap with black markings "Morado" written on each package. The
packages were seized and transported to the Los Angeles Field
Division (LAFD). At LAFD the packaged weight was approximately
17 kilograms. The suspect packages of fentanyl were later
transported to the DEA Southwest Laboratory for testing and
analysis and tested positive for fentanyl with a net weight of
approximately 14.4 kilograms.

39.   Law enforcement obtained WhatsApp text messages
between Co-Conspirator 1 and the -8440 number. Following an
administrative subpoena to T-Mobile for the -8440 number, law
enforcement personnel learned that the -8440 number was used by
UGALDE, who provided the Minto Way Address as his address. From
the identifying information law enforcement personnel received
from the T-Mobile subscriber information, law enforcement was
able to obtain a California driver's license photograph and
other personal identifying information for UGALDE. Based on the
identifying information law enforcement received for UGALDE as
well as the corroborating WhatsApp text messages between Co-
Conspirator 1 and the -8440 number, law enforcement personnel
were able to identify that "Wilbert" was UGALDE and that UGALDE

was the supplier for the approximately 15 kilograms of fentanyl to Co-Conspirator 1.

40.    The text messages obtained by Law Enforcement show that UGALDE requested 15 minutes advance notice prior to Co-Conspirator 1's arrival at the meet location. Co-Conspirator 1 texted UGALDE at 4:48 p.m. that he/she was 25 minutes away. DEA Agents confirmed that the Minto Way Address is within 15 minutes driving time from 32230 Sage Road, Hemet, CA.

41.    Given the extremely rural nature of the area and that there are limited driving routes available for UGALDE to reach the meeting location from the Minto Way Address, I believe it is likely that UGALDE traveled to the meeting location at 32230 Sage Road from the Minto Way Address. Agents performed vehicle/aerial surveillance of Minto Way Address on multiple occasions, located the Challenger at Minto Way Address, and confirmed it would take UGALDE around 10-15 minutes to drive from the Minto Way Address to 32230 Sage Road, Hemet, CA.

42.    I believe UGALDE directed Co-Conspirator 1 to meet at 32230 Sage Road, Hemet, CA, due to it being located on the pathway to the only nearby major road from the Minto Way Address and because it provided UGALDE easy access from the Minto Way Address, and because it allowed UGALDE to deliver a large amount of fentanyl without having to reveal to Co-Conspirator 1 UGALDE's stash location (which I believe to be the Minto Way Address).

43.    On May 29, 2024, the Honorable Steve Kim, United States Magistrate Judge for the Central District of California,

authorized a federal search warrant for the Minto Way Address.
The assigned court case number is 2:24-mj-03137.

### F. DEA Conducts a Search of the Minto Way Address and Finds Fentanyl

44. On June 22, 2024, at approximately 6:15 am, LAFD
agents executed the search warrant at the Minto Way Address. As
a result, agents located the Dodge Challenger that is registered
to UGALDE.

45. During the execution of the warrant, agents picked a
lock that secured a door for the interior of a portion of the
detached garage, where UGALDE's vehicle was parked in front of.
Once inside, I observed the garage had been divided by pieces of
plywood. The portion of the garage with the locked door, was for
a make-shift workout room that had some weight equipment,
guitars, as well as multiple rifles that were located in plain
view on top of an empty plastic container and others scattered
throughout the room. Additionally, in the vicinity of the
rifles, I located a green backpack. Inside one of the zippers
for the backpack was a clear Ziploc bag that contained small
blue round pills stamped with "M" that were subsequently seized,
as witnessed by SA Daniel Mendoza. Based on my knowledge,
training, and experience, the blue pills were suspected to be
fentanyl pills and are commonly sold by drug trafficking
organizations. Near the backpack and rifles, I also located an
empty Amazon package that was addressed to Humberto UGALDE at
the Minto Way Address. Near the Amazon package and backpack was
a black digital scale with white powdery residue. Additionally,

in the same room and near the scale, was a spiral notebook that was a ledger with various amounts and names such as "Patas 22,000" and a breakdown of a balance sheet with two columns that indicate "have" and "need", which is common among drug traffickers to manage their stash of narcotics that they currently have, what is sold, and what they need for resupply.

46.   The guns that were inside of the weight room with the suspected fentanyl and drug ledger, consisted of a brown musket type rifle, a Savage bolt action rifle with a scope (a law enforcement query confirmed this rifle was stolen), a Springfield 12 Gauge shotgun, a bolt action rifle, a Mossberg 12 Gauge shotgun, a Stoeger shotgun, an M-1 rifle, a High Point rifle, and a Marlin bolt action rifle. These firearms were subsequently seized. This section of the garage was only accessible though the secured door that had a lock. There was also a staircase with a second level above the room, however, this portion of the garage was entirely covered with dust and spider webs/cobwebs and appeared to not have been any form of living space in quite some time. The other sections of the garage included a carport that had a hydrologic press commonly used to press kilograms of narcotics. The other sectioned off part of the garage included a tool area. There were also a variety of other rifles and pistols that were found in the main living space of the Minto Way Address.

47.   During the search of the Minto Way Address, agents did not locate UGALDE, but located his girlfriend E.B. According to E.B., she and UGALDE have lived at the Minto Way Address for

approximately ten years and no one else lives there with them
other than their juvenile son who was also present. She
indicated that UGALDE went down to Mexico on Saturday (June 8,
2024) and will be there until around July 1, 2024. E.B.
indicated that she works from home and that UGALDE does not have
a regular job, but in the past has done side projects such as
fencing. She was unaware of UGALDE being involved in narcotics.
She indicated that UGALDE is the only person that accesses the
detached garage area, as well as the weight area. E.B. indicated
she does not go into the garage, as she does not have keys for
the locks, but UGALDE does.

    48.   While at the Minto Way Address, E.B. gave consent for
agents to call UGALDE from her cellphone. As SA Parra observed,
I then placed a phone call to UGALDE that was saved as a contact
as "hunny". UGALDE answered and stated hey hunny, he was then
informed by SA Parra that it was not his hunny and that UGALDE
was speaking to two agents with the DEA. He was informed that
agents have a search warrant for his house and that we wanted to
speak with him. He indicated that he was in Mexico. SA Parra
told UGALDE that we have a warrant and that we need to access
the safe, which was located in the juvenile child's bedroom
closet. UGALDE stated that there was nothing in there and that
he couldn't give us a passcode, because he wasn't sure who we
are, even though he observed us from his surveillance cameras
clearly dressed in Police insignia. Agents subsequently had a
locksmith arrive to the scene who forced entry into the safe.
Inside the safe agents located $10,150 in United States

Currency, along with approximately 7 pistols, various ammunition, and UGALDE's social security card. The phone conversation between DEA agents and UGALDE was recorded and took place in English. The pistols, cash, and some magazines and bullets were seized.

49.   The suspected fentanyl pills were transported to the DEA Southwest Laboratory. The pills weighed approximately 185 grams.

50.   On July 1, 2024, the test results came back positive for fentanyl.

## V.  LAW ENFORCEMENT OBTAIN THE SUBJECT DEVICE ASSOCCIATED WITH THE -8440 NUMBER

51.   On July 1, 2024, UGALDE entered the United States via the vehicular border crossing at Otay Mesa, Port of Entry located in San Diego, CA.

52.   Law enforcement arrested UGALDE based on the fentanyl found in his residence during the execution of the search warrant on June 22, 2024.

53.   At the time of his arrest, UGALDE was in possession of the SUBJECT DEVICE, which was associated with the -8440 number that was used to coordinate the delivery of fentanyl to Co-Conspirator 1. Following seizure of the SUBJECT DEVICE, I placed a phone call to the -8440 number and it rang, as witnessed by SA Brent Pickard. Thus confirming the phone in UGALDE's possession was the -8440 number.

## VI. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

54. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to

have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug

trafficker lives with others who may be unaware of his criminal activity.

h.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

### VII.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

55.   As used herein, the term "digital device" includes the SUBJECT DEVICE.

a.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

i.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they

are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   ii. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   iii. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   iv. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement

23

continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

b.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

i.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

ii.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

56.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

//

//

//

//

## VIII.     CONCLUSION

57.  For all of the reasons described above, there is probable cause to believe that UGALDE has committed violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of a drug trafficking crime), and that evidence, fruits, and instrumentalities of the SUBJECT OFFENSES will be found in a search of the SUBJECT DEVICE, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of July,
2024.

_____
THE HONORABLE BRIANNA MIRCHEFF
UNITED STATES MAGISTRATE JUDGE